[Docket Nos. 72, 73]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| DEEP WATER RECOVERIES (S) PTE LTD,<br><br>              Plaintiff,<br><br>    v.<br><br>LOST AND ABANDONED SILVER BULLION located within 160 nautical miles southeast of the port in Salalah in Oman, *in rem*<br><br>              Defendant. | Civil Action No. 1:21-11949 (RMB-EAP)<br><br>          **OPINION** |

**APPEARANCES**

FLASTER/GREENBERG PC
Adam Edward Gersh
1810 Chapel Avenue West
Cherry Hill, NJ 08002

BOYLE & JASARI LLP
Dennis Boyle
1050 Connecticut Avenue NW Suite 500
Washington, DC 20036

*Attorneys for Deep Water Recoveries*

UNITED STATES DEPARTMENT OF JUSTICE
Jeanne Louise Amy
175 N Street NE 8th Floor
Washington, DC 20002

*Attorney for the United States Government*

**RENÉE MARIE BUMB, Chief United States District Judge**

Captain Jack Sparrow of *Pirates of the Caribbean* fame claimed that "not all treasure is silver and gold, mate." PIRATES OF THE CARIBBEAN: THE CURSE OF THE BLACK PEARL, Disney Plus, at 1:15:10-1:15:14 (Walt Disney Pictures 2003). In this case, Plaintiff Deep Water Recoveries ("Plaintiff" or "DWR") thinks Captain Jack is wrong. DWR believes there is an immense amount of undiscovered silver bullion at the wreck site of the *SS John Barry*, which lays 160 miles off the coast of Oman and 8,500 feet under the Arabian Sea. Since its tragic sinking on August 28, 1944, rumors have circulated that an unquantified amount of silver bullion was onboard the vessel. DWR, and its founder Dorian Ball, have been fascinated by the wreck and the possibility of discovering the mysterious silver for decades. Plaintiff moves for

2

Summary Judgment on the basis that the silver bullion is either abandoned Government property or was private property at the time of the vessel's sinking, and therefore the United States Government (the "Government") possesses no titular or ownership rights to the silver bullion.    The Government moves for Summary Judgment on the basis that it has never explicitly abandoned the wreck or any of its cargo, and that there is no concrete evidence that the bullion was privately owned or even exists.[1]    The Court, upon finding genuine disputes of material fact, will **DENY** both motions.    The Court intends to **SCHEDULE** this matter for **TRIAL** upon submission of the Final Pre-Trial Order.

## I.    PROCEDURAL AND FACTUAL BACKGROUND[2]

This action began with Plaintiff filing a complaint on May 28, 2021.    [Docket No. 1 (Compl.).]    During this initial stage of the litigation, Plaintiff filed a Motion for Default Judgment on May 27, 2022 which this Court accepted on July 26, 2022.[3]    [Docket No. 25 (Pl.'s Mot. for Default J.); Docket No. 26 (Granting Pl.'s Mot. for Default J.).]    However, the Government filed a Motion to Vacate Order of Default Judgment on July 14, 2023, which this Court granted on January 29, 2024.    [Docket No. 28 (Gov.'s Mot. to Vacate Default J.); Docket No. 37 (Granting Gov.'s Mot. to

---

[1] The United States Government's Motion to Intervene was granted on November 27, 2024. [Docket No. 46.] To avoid confusion, this Court will not use the term "Defendant" in this Opinion, and instead it will refer to the Government to parallel what the parties have done in their briefing.

[2] Unless otherwise indicated, exhibit citations are to those appended to the respective party's brief.  The Court additionally requests that the parties cite only *material* facts necessary to resolve a motion for summary judgment. *See* D.N.J. LOC. CIV. R. 56.1(a).

[3] This Order was entered by the Honorable Joseph H. Rodriguez who presided over this action until it was reassigned to this Court on October 7, 2025.  [Docket No. 67.]

Vacate Default J.).]  The United States Government was allowed to intervene in the proceedings because it remains the owner of the *SS John Barry* and therefore has a valid interest in protecting its property.  [Docket No. 45; Docket No. 46.]

After the Motion for Default Judgment was vacated, the Government provided its Answer to the Complaint on January 3, 2025.  [Docket No. 51 (Answer).]  Both parties then filed Motions for Summary Judgment with this Court on March 27, 2026.  [Docket No. 72 (Pl.'s MSJ); Docket No. 73 (Def.'s MSJ).]  In response to these motions, both sides produced Opposition Briefs on April 6, 2026, and a Reply Brief was also filed by each party to the respective Opposition Briefs on April 13, 2026.  [Docket No. 75 (Pl.'s Opp'n to Def.'s MSJ); Docket No. 76 (Def.'s Opp'n to Pl.'s MSJ); Docket No. 77 (Pl.'s Rep. to Def.'s Opp'n); Docket No. 78 (Def.'s Rep. to Pl.'s Opp'n).]  Additionally, this Court ordered both parties to provide briefs, along with replies, on why jurisdiction has or has not been properly established in this action on June 3, 2026 in preparation for oral argument that was held on July 8, 2026. [Docket No. 79.]  The initial briefs were provided by both parties on June 23, 2026, and the replies were shared on June 30, 2026.  [Docket No. 80; Docket No. 82; Docket No. 83; Docket No. 84.]  Finally, as a part of the June 3, 2026 Order this Court asked the Plaintiff to bring the one-silver riyal coin that is being used as a means to establish jurisdiction to oral argument, and later on July 1, 2026, this Court asked the Plaintiff to provide the details of the coin's whereabouts.  [Docket No. 79; Docket No. 85.]  The Plaintiff did so on July 6, 2026, and the coin was presented to this Court during oral argument on July 8, 2026.  [Docket No. 86.]

4

The origins of the current dispute date back to World War II.  As part of the Lend Lease Program, the Government quickly built merchant marine ships, often referred to as the Liberty class, that carried goods across the Atlantic Ocean to provide support to foreign nations.  [Docket No. 73-2 (Gov.'s SOMF) ¶ 1.]  The *SS John Barry* was one such ship.  [Docket No. 76 (Gov.'s Resp. to Pl.'s SOMF) ¶ 2.]  On August 28, 1944, the *SS John Barry* sank off the coast of Oman from damage incurred by two torpedoes fired from a German U-Boat.  [Gov.'s SOMF ¶ 2.]  The vessel headed for Saudi Arabia was carrying "heavy machinery, rail equipment, and 3,000,000 silver one-riyal coins minted by the United States for Saudi Arabia."  [*Id.* ¶ 3.]

Roughly a year after the ship sank, the rumors regarding silver bullion being on the *SS John Barry* started to swirl.  [*Id.* ¶ 4.]  The rumors first originated from a Coast Guard report that was attributed to the captain and an unnamed crewmember.  [*Id.*, citing Ex. B.]  Then, in 1989, while contracting with salvage companies for the rights to search the ship, the Government listed an unquantified amount of silver bullion on its Invitation for Bids, further intensifying the rumors of the mysterious bullion. [Docket No. 72-2 (Pl.'s SOMF) ¶ 3; Docket No. 76 at 3.]  Later, in 1995, the founder of DWR, Dorian Ball, became interested in and started to research the *SS John Barry* after reading *Stalin's Silver*.  [Pl.'s SOMF ¶¶ 4–5.]

In 1989, the United States Maritime Administration ("MARAD") awarded the right to salvage the vessel's cargo to the John Barry Group.  [Gov.'s SOMF ¶ 5.] Shortly after winning these rights, the John Barry Group transferred the contract to the Ocean Group, and the first salvage operation began in 1994.  [*Id.* ¶ 6.]  During this

expedition, 1,400,000 of the 3,000,000 silver one-riyal coins were taken, but no evidence of the silver bullion was discovered during this or any later expedition. [*Id.* ¶¶ 6, 16–17.]

After this initial expedition to the *SS John Barry*, in 2002, Ball began to communicate with MARAD and the Ocean Group to gain their respective approvals so his salvage companies could search the wreck. [Pl.'s SOMF ¶¶ 6–8.] In 2005, Ball was successful and a joint expedition consisting of Ocean Group and DWR employees visited the wreck via remote submersibles. [*Id.* ¶ 9.] It was during this visit that the silver one-riyal coin that was shown to this Court during oral argument on July 8, 2026 was taken from the *SS John Barry*. [*Id.*; Gov.'s SOMF ¶ 10.] Since this expedition in 2005, the wreck was visited by DWR in 2021 after this Court granted the Motion for Default Judgment which was later vacated. [Docket No. 81, citing Ex. 1.] During these visits, DWR has not found any silver bullion nor any concrete evidence that suggests it resides near the *SS John Barry*. [*Id.*]

In 2012, the rights to the *SS John Barry* fully ceded back to the United States Government. [Gov.'s SOMF ¶¶ 11–12.] This transfer of rights back to the Government was acknowledged by Ball's International Cargo Recoveries, LTD ("ICRL") attorneys via the following statement: "the rights, title, and interest of the Government in the sunken vessel John Barry, together with the un-salvaged Government-owned cargo remaining on board, have reverted to the United States

6

Government."[4]  [*Id.*]  This statement from 2012 – that the Government possesses the rights, title and interest over the *SS John Barry* – remains true today.  [*Id.*]  Therefore, in the present action DWR is **only** seeking the rights to salvage the silver bullion and has no intent to salvage the *SS John Barry* or any of its other cargo.  [Pl.'s MSJ at 9.]

Additionally, there is a separate history, outside of the tragic sinking of the vessel and the salvage rights to the wreck – the history of the undiscovered silver bullion.  As previously noted, the first known report of the silver bullion's possible existence was made about a year after the sinking of the vessel.  [Gov.'s SOMF ¶ 4.] There is no evidence of the silver bullion's existence **prior to or during** the vessel's trip to Saudi Arabia in 1944.  In the first round of solicitations for the salvage rights to the wreck that the Government conducted in 1978, which were subsequently cancelled, no reference to the silver bullion was made on the listing.  [*Id.* ¶ 14.]  It was only when the Government first acknowledged the silver bullion during the second contracting correspondence with salvage companies in 1989 where it was reported as Government owned cargo.  [*Id.* ¶ 15; Pl.'s SOMF ¶ 3.]

Finally, the two parties in this action have opposing views on whether the silver bullion exists, and if it does, who is the rightful owner.  The Government offers two key facts to defend its position: (1) "Plaintiff is not and never has been in possession of any silver bullion" and (2) "Plaintiff concedes that it has no tangible evidence that

---

[4] Ball was also the owner of ICRL, a British Virgin Islands based company that is no longer operating.  During his deposition, Ball explained the relationship between DWR and ICRL as follows: "[w]e set up Deep Water Recoveries to actually do salvage and International Cargo Recoveries, ICRL, to sell the salvaged artifacts.  But in the event, we never salvaged any artifacts during the course of that arrangement, and we then just dropped or closed down ICRL. But both – my wife and I typically ran both companies." [Docket No. 81-1 at 23.]

the silver bullion exists." [Gov.'s SOMF ¶¶ 16–17.] Alternatively, DWR states that the Government's denials of the silver bullion's existence and their lack of documents that suggest ownership make the silver bullion unclaimed and lost property. [Pl.'s SOMF ¶¶ 17–19.] These two competing narratives are at the core of this action.

## II.    LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be *no* genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id*. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding the existence of a genuine issue of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). Nevertheless, "the mere existence of a scintilla of

evidence," without more, will not give rise to a genuine issue for trial. *Anderson*, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate "[w]here the record ... could not lead a rational trier of fact to find for the nonmoving party...." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87. "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a "fair-minded" jury could "reasonably" decide.'" *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)). If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

"When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)). That one of the competing motions is denied does not imply that the other must be granted. For each

motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (citations and quotation marks omitted); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

### A. Jurisdiction

In this action, determining how jurisdiction can properly be established is a novel issue.[5] First, a federal court may exercise jurisdiction over a salvage action when it has acquired jurisdiction over the res, either through arrest of the wreck or a sufficient portion thereof. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 966–68 (4th Cir. 1999), *cert. denied*, 528 U.S. 825 (1999). For example, the District Court of the Virgin Islands exercised jurisdiction over a salvage dispute concerning a shipwreck off the coast of the U.S. Virgin Islands. *See Sunken Treasure, Inc. v. Unidentified, Wrecked & Abandoned Vessel*, 857 F. Supp. 1129, 1130 (D.V.I. 1994). Here, the *SS John Barry,* and any silver bullion that would be discovered, are not physically within the jurisdictional boundaries of any court in this nation because it resides off the coast of Oman.

---

[5] In this action, there is no controlling jurisprudence that binds this Court. The cases discussed below, particularly *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943 (4th Cir. 1999), *cert. denied*, 528 U.S. 825 (1999), are persuasive authority that this Court adopts.

DWR contends that this Court may exercise *quasi in rem* jurisdiction because courts have authority to resolve competing claims among salvors seeking to conduct salvage operations on the same shipwreck. *See Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 334 (5th Cir. 1978). Here, this argument is inconsistent with the record because there is no evidence that multiple salvors are currently competing for the rights to the *SS John Barry* or the silver bullion, and DWR's contention that the Government is a party in the salvaging action lacks merit. [Docket No. 82 at 5.] The Government is not attempting to salvage the undiscovered silver bullion but rather is only interested in protecting its ownership rights to the *SS John Barry*. [*Id.*]

In cases involving shipwrecks located in international waters, courts have frequently relied on the doctrine of *constructive in rem* jurisdiction as articulated by the Fourth Circuit in *R.M.S. Titanic*. 171 F.3d at 964; *see The Ann*, 13 U.S. 289, 291 (1815); *see also California v. Deep Sea Rsch., Inc.*, 523 U.S. 491, 496 (1998). Under that doctrine, the salvager submits a piece of the wreck, which serves as the *constructive res*, with a District Court. *R.M.S. Titanic*, 171 F.3d at 956. A piece of the wreck may suffice because it is not feasible for the entirety of the wreck to be submitted. *Id.* For example, in *R.M.S. Titanic* the salvage company involved in the action submitted a wine decanter to the United States District Court for the Eastern District of Virginia. *Id.* at 952.

11

Here, the nature of the item submitted with this Court meets the standard of a proper submission. DWR's New Jersey counsel possesses the one-silver riyal coin that was taken off the *SS John Barry* during the 2005 expedition, and it was displayed to this Court on July 8, 2026. Yet, both parties agree that DWR **is not** attempting to salvage these silver coins from the *SS John Barry*. Instead, DWR wants to salvage **only the undiscovered silver bullion** that it suggests is on the ship or around the wreck site. This Court finds that jurisdiction can properly be extended to the silver bullion based on the submission of the silver coin because the parties agree both items came from the same vessel, the *SS John Barry*. Even though the silver bullion has not been discovered, it would appear unusual to suggest (and the parties do not) that submissions of other pieces of *res* from the wreck cannot be used to establish jurisdiction for disputes over any undiscovered items from the same vessel in salvage actions. *Treasure Salvors,* 569 F.2d at 335 (finding jurisdiction could be extended to all items remaining on the sunken vessel because it was otherwise infeasible to retrieve the entire wreck and bring it within the Court's borders). Therefore, jurisdiction has been properly established in this action.

### B. The *SS John Barry* as Abandoned Property

Operating under the assumption that the silver bullion exists, DWR and the Government have directly opposing views over whether the Government has abandoned its ownership rights to the silver bullion. The Eleventh Circuit held that abandonment of certain types of Government property cannot occur "absent an

affirmative act authorized by Congress." *Int'l Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258 (11th Cir. 2000); *see Royal Indem. Co. v. United States*, 313 U.S. 289, 294 (1941). Applying this principle, the Eleventh Circuit held that the Government did not abandon a military aircraft when it struck it from its active inventory as that action alone did not amount to the affirmative act necessary to relinquish the Government's ownership. *Int'l Aircraft Recovery, L.L.C.*, 218 F.3d at 1259–60. Furthermore, this standard for abandonment has also been extended to privately owned shipwrecks with the Fourth Circuit holding that "there is also a strong actus element required to prove the necessary intent [of abandonment]." *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 461 (4th Cir. 1992). Finally, ships that sunk far before the *SS John Barry*, such as vessels that were lost during the Civil War, have not been viewed as abandoned Government property. *See United States v. Steinmetz*, 973 F.2d 212, 214, 222–23 (3d Cir. 1992) (holding that the bell that was on the Confederate vessel the *C.S.S. Alabama*, which became property of the United States following the Civil War, was not abandoned property and still belonged to the Navy when it appeared in an auction in 1990.)

Here, DWR claims that the silver bullion has been abandoned because the Government has denied its existence. In contrast, the Government contends that they have not made any sort of affirmative action to show it no longer has any possessory interest or ownership rights to any silver bullion that is on or near the *SS John Barry*. The Government has not positively stated that the silver bullion exists, but the lack of such a statement is quite different than an outright denial of the silver bullion

13

being on or around the *SS John Barry*. Therefore, DWR and the Government's abandonment arguments raise genuine disputes of material fact that must be fully litigated and cannot be resolved via summary judgment at this time.

### C. The *SS John Barry* as Private Property

DWR also argues that the silver bullion was private property while being carried by the *SS John Barry*. Applying this theory, DWR contends that since no party has claimed ownership since the sinking of the boat in 1944 the silver bullion can be classified as lost property with an unknown true owner. DWR does not produce much evidence beyond speculation to show that the silver bullion was in fact privately owned while on board the *SS John Barry*. Additionally, its passage on a Government owned ship places a large burden for DWR to do so. DWR admits that the Government did nationalize the Merchant Marine Fleet during World War II, and therefore for an item to be proven as privately owned on the *SS John Barry* clear evidence must be provided. *See* Merchant Marine Act, 1936, 46 U.S.C. §§ 1101–1294 (1958). Although DWR correctly points out that private cargo was carried by merchant marine ships during World War II, it offers little substantive evidence that the silver bullion was indeed privately owned during its voyage to Saudi Arabia.

Moreover, because nothing in the record suggests that the silver bullion was privately held, the Eleventh Circuit's reasoning in *Odyssey Marine* is instructive. There, the court observed that "there is an undeniable potential for injury to Spain's interest if we separated the *Mercedes* from its cargo and upheld an arrest of the cargo found and

14

salvaged from a warship that is entitled to immunity." *Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1182 (11th Cir. 2011).[6]  In *Odyssey Marine*, the Eleventh Circuit held that the cargo on the Spanish warship *Nuestra Senora de las Mercedes* was not separable from the vessel because the Spanish Government's immunity rights to the vessel would be greatly reduced if the cargo was treated as separate property.  *Id*. at 1180.  Here, a similar argument can be made for the *SS John Barry* and any cargo onboard.  Therefore, there is a material dispute between the parties regarding whether or not the silver bullion was private property on the *SS John Barry*. Plaintiff relies almost solely on his client's own deposition testimony to show that the silver bullion was privately owned.  A factfinder must assess this testimony to determine credibility.  **The burden to prove that it was privately owned is DWR's**, because there is no doubt the vessel itself was, and remains, Government property. Therefore, because a genuine dispute of material fact exists, the Summary Judgment Motions will be **DENIED**.

* * * * * * * *

---

[6] In *Odyssey Marine*, the case was dismissed on the grounds of a lack of subject matter jurisdiction which is a different cause of action than the current dispute.  However, this Court adopts the part of the holding from *Odyssey Marine* that focuses on the separability of the vessel and the cargo it carried because of its clear relevance to the present action.

15

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment will be **DENIED**, and the Government's Motion for Summary Judgment will be **DENIED**. The Court intends to **SCHEDULE** this matter for **TRIAL** upon submission of the Final Pre-Trial Order.  An accompanying Order shall issue.

DATED: **July 23, 2026**                    **/s/Renée Marie Bumb**
                                            RENÉE MARIE BUMB
                                            Chief United States District Judge

16